IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 25-45 |
| ) | |
| ANASTACIO HERNANDEZ-US ) | |

**MEMORANDUM OPINION**

    Presently before the Court is the Government's Motion for Revocation of Order of Pretrial Release entered by United States Magistrate Judge Patricia L. Dodge, which is opposed by Defendant Anastacio Hernandez-Us.  (*See* Docket Nos. 24, 32, 33, 34).  The Government advocates that this Court should reverse Judge Dodge's finding that Defendant does not pose a serious risk of flight, schedule a detention hearing, and revoke the release order.  Defendant disagrees, arguing that the Government's proffer at his Initial Appearance was insufficient to establish by a preponderance of the evidence that he poses a serious risk of flight.  After careful consideration of the parties' positions, review of the transcript of the Initial Appearance, the Pretrial Services Report and the additional proffered evidence submitted by the Government to supplement the record, (Docket Nos. 26, 32-2, 32-3, 32-4, 32-5),  the Government's Motion will be granted insofar as the Court will reverse the finding that Defendant does not pose a serious risk of flight.  Given that ruling, a detention hearing will be conducted, after which the Court will determine whether Defendant should be released on conditions or whether detention pending trial or other disposition of this matter is warranted.

1

I.      **BACKGROUND**

    A.  **PROCEDURAL HISTORY**

On February 25, 2025, Defendant was charged in a one-count Indictment with illegal re-entry of a removed alien, in violation of 8 U.S.C. § 1326, for conduct occurring on or about February 7, 2025. (Docket No. 1). An arrest warrant was issued for Defendant on that same date. (Docket No. 3).

On February 28, 2025, Judge Dodge scheduled an Initial Appearance to occur on March 5, 2025. (Docket No. 9). Also on February 28th, the Government filed a request for detention, contending that no condition or combination of conditions will reasonably assure Defendant's appearance as required and the safety of any other person and the community because he is a flight risk. (Docket No. 10 at 1). The Government asserted that it was entitled to a detention hearing because a serious risk exists that Defendant will flee. (*Id.* at 2). On March 4, 2025, Defendant filed a Motion for Immediate Release, wherein he argued that a detention hearing was unwarranted because the Government would be unable to proffer evidence establishing that he poses a serious risk of flight, and merely pointing to an ICE detainer is insufficient to sustain its burden. (*See generally* Docket No. 12).

Given that Defendant was being held in ICE custody, he appeared at the Initial Appearance and Arraignment held on March 5, 2025 pursuant to a writ of habeas corpus ad prosequendum. (Docket Nos. 6, 7, 8, 14, 16). Regarding the matter of detention, the Government confirmed it was seeking detention solely based on its contention that Defendant poses a serious risk of flight. (Docket No. 26 at 10). To that end, the Government agreed that the existence of an ICE detainer and the possibility of Defendant's removal from the United States are not evidence of a serious risk of flight. (*Id.* at 10-11). The Government then proffered the reasons why Defendant poses a

serious risk of flight, and maintained that a detention hearing therefore was warranted. (*Id.* at 11-15). In response, Defendant's counsel argued that the Government's proffer was insufficient to show that he poses a serious risk of flight, requested that Judge Dodge deny a detention hearing, and release him on the least restrictive conditions. (*Id.* at 16-18). Ultimately, Judge Dodge determined that the Government failed to establish by a preponderance of the evidence that Defendant poses a serious risk of flight, granted his Motion for Immediate Release, and entered an ordered releasing him on a $25,000 unsecured appearance bond with conditions. (*Id.* at 22; Docket Nos. 20, 21, 22). However, Judge Dodge stayed the pretrial release order for 24 hours to allow the Government to consider whether to appeal the order. (Docket No. 26 at 26, 31-32). Given Judge Dodge's findings and order releasing Defendant, the matter did not proceed to a detention hearing.

On March 6, 2025, the Government filed a Motion for Revocation of Order of Pretrial Release and for Continued Stay of Release Order. (Docket No. 24). That same day, this Court granted the Government's Motion only as to its request that the stay be continued until such time as the Court rules on the Government's Motion to revoke the release order and request for detention. (Docket No. 25). The Court also entered an order establishing a briefing schedule and directing that the transcript of the proceedings before Judge Dodge be filed. (*Id.*).

Subsequently, on March 10, 2025, the Court held a telephone conference of counsel to discuss the status of the case and upcoming deadlines. (Docket No. 28). During that conference, the Court observed that a Pretrial Services Report was not available in the case and confirmed with both counsel that it would be appropriate to request that one be prepared. A Pretrial Services Report subsequently was completed and circulated to the parties and the Court via email on March 14, 2025.

After obtaining a short extension, the Government filed a brief in support of its Motion to Revoke the release order on March 17, 2025, Defendant filed his brief in opposition thereto on March 20, 2025, and the Government filed a Reply on March 25, 2025. (Docket Nos. 29-34). The matter is now ripe for disposition.

### B. **EVIDENCE PROFFERED BY THE PARTIES**

As stated, the Government affirmed at the Initial Appearance that it was seeking detention because Defendant poses a serious risk of flight. (Docket No. 26 at 9-10). The Government explained that its position was not premised on the existence of an ICE detainer or the possibility of Defendant's removal from the United States, but rather "the facts [and] personal circumstances as they relate to [him]." (*Id.* at 11). To that end, the Government proffered the following:

- Defendant is a citizen of Guatemala, who was arrested by ICE agents in the Pittsburgh area on February 7, 2025. (Docket No. 26 at 11). At the time of his arrest, Defendant was in a vehicle with three other individuals, who admitted that they were illegally present in the United States. (*Id.* at 11-12). Law enforcement did not recover any identification from Defendant when he was arrested, but they did recover $495 from his person. (*Id.* at 12).

- Defendant has had prior encounters with immigration authorities. (Docket No. 26 at 12). In May 2005, Defendant attempted to illegally enter the United States near the U.S. Border Patrol's Casa Grande Station in Tucson, Arizona. (*Id.*). During the encounter, Defendant provided a false name and a fictitious date of birth to the authorities. (*Id.*). At that time, he was permitted to voluntarily return to Mexico. (*Id.*).

- In July 2005, Defendant entered the United States after paying a smuggler $5,000 to sneak him across the United States border near Arizona. (Docket No. 26 at 12). After successfully entering the United States, he remained in the country illegally until he was involved in a traffic stop while traveling from Florida to Louisiana in September 2010. (*Id.*). At the time, Defendant was found to be in possession of a Guatemalan passport bearing his real name, his date of birth, and his photograph. (*Id.*).

- Following the incident in September 2010, a federal immigration judge ordered Defendant's removal from the United States, which he did not

appeal.[1]  (Docket No. 26 at 12-13).  Defendant was advised that he was prohibited from entering, attempting to enter or being in the United States for a period of ten years from the date of his departure from the United States, he was advised of the ways that he could legally return to the United States after that ten-year period, and he was further advised that re-entry by a removed alien was a crime pursuant to federal law.  (*Id.* at 13).  ICE formally removed Defendant from the United States on September 23, 2010.  (*Id.*).  The verification of removal form contains his photograph, along with his right index fingerprint and his signature.  (*Id.*).

- Defendant did not have permission or consent from the Secretary of the Department of Homeland Security to re-enter the United States.  (Docket No. 26 at 13).

- The Government is not aware that Defendant has any prior criminal history.  (Docket No. 26 at 14).

- The Government is not aware that Defendant has any communal or familial ties to this District or to the United States generally.  (Docket No. 26 at 14).  Defendant reported that his parents and wife reside in Guatemala.  (*Id.*).

- Although it is believed that Defendant was working at a restaurant, he has no legitimate employment record given that he is undocumented and therefore cannot legally be employed in the United States.  (Docket No. 26 at 14).

- Defendant was residing in the North Hills area of Pittsburgh in what law enforcement believed to be a shared residence with several of his co-workers.  (Docket No. 26 at 16).

The Government argued that the foregoing circumstances established by a preponderance of the evidence that Defendant is a serious risk of flight, thus a detention hearing was warranted. (Docket No. 26 at 15).  Defense counsel disagreed, pointing out that certain statistics indicate that undocumented individuals have a higher rate of appearance in court than people who are United States citizens.  (*Id.* at 16).  Defense counsel also highlighted Defendant's lack of criminal history and argued the fact that he allegedly provided a false name and date of birth 20 years ago is

---

1  According to the Government, Defendant did not claim asylum in his prior immigration proceeding, and he denied any fear of being harmed or persecuted if he were to return to Guatemala.  (Docket No. 26 at 14).

5

insufficient to sustain the Government's burden. (*Id.* at 17-18).

The Government subsequently attached four exhibits to its brief in support of the Motion to Revoke the release order: (1) a group exhibit relative to Defendant's 2010 encounter with immigration authorities consisting of a Record of Deportable/Inadmissible Alien dated July 1, 2010, a Notice to Appear dated July 1, 2010, an Order of the Immigration Judge dated September 2, 2010, a Warrant of Removal/Deportation dated September 3, 2010, and a Warning to Alien Ordered Removed or Deported dated September 3, 2010 (collectively, "Govt. Ex. B"); (2) Defendant's Guatemalan passport ("Govt. Ex. C"); (3) documents related to Defendant's February 2025 encounter with immigration authorities, including a Record of Deportable/Inadmissible Alien, a Notice of Intent/Decision to Reinstate Prior Order, a Notice of Custody Determination, and a Warrant for Arrest of Alien, all dated February 7, 2025 (collectively, "Govt. Ex. D"); and (4) a property search record for a particular residence located in Cranberry Township, Pennsylvania associated with Emiliano's restaurant ("Govt. Ex. E"). (*See* Docket Nos. 32-2; 32-3; 32-4; 32-5).

First, Govt. Ex. B indicates that Defendant is a citizen of Guatemala,[2] who illegally entered the United States on July 5, 2005, after paying an unknown individual $5,000 to smuggle him from Mexico to the United States. (Docket No. 32-2 at 2). Govt. Ex. B further indicates that Defendant was arrested in July 2010 following a traffic violation while travelling from Florida to Louisiana to work. (*Id.*). An immigration judge ultimately ordered Defendant's removal from the United States in September 2010, which he did not appeal. (*Id.* at 7). Additionally, Govt. Ex. B shows that Defendant was issued a Warrant of Removal/Deportation and was advised that he was subject

---

[2] The Pretrial Services Report reflects that Defendant, who is currently 46 years old, was born in Guatemala. Defendant's mother, wife of 28 years, and three daughters (ages 26, 21, and 12) all reside in Guatemala. He reported that he also has four brothers and five sisters, who all reside in Guatemala.

to removal/deportation from the United States based upon a final order by an immigration judge. (*Id.* at 4). That form contains Defendant's photograph, right index fingerprint, and signature. (*Id.* at 5). Defendant also was served with a form entitled "Warning to Alien Ordered Removed or Deported" advising that he was prohibited from entering the United States for a period of ten years from the date of his departure because he was found inadmissible and ordered removed from the United States by an immigration judge as a result of having been present in the United States without admission or parole. (*Id.* at 6). The form further informed Defendant that he must request and obtain permission from the Secretary of the Department of Homeland Security before returning to the United States. (*Id.*). The form also warned that re-entry by a removed alien is a felony punishable by imprisonment for a term of 2 to 20 years. (*Id.*). Defendant was removed from the United States on September 23, 2010. (*Id.* at 11).

Next, as reflected in Govt. Ex. D, Defendant was apprehended by ICE operations in Pittsburgh on February 7, 2025. (*See* Docket No. 32-4). Govt. Ex. D sets forth the details of Defendant's arrest as the Government described in its proffer at the Initial Appearance. (*Id.* at 2). Additionally, Govt. Ex. D indicates that Defendant was working at Emiliano's restaurant in Cranberry Township, Pennsylvania,[3] and the address where he was believed to be residing was known to law enforcement. (*Id.* at 2, 3). Govt. Ex. D also reflects that ICE issued an immigration warrant for Defendant's arrest after it was determined that there was probable cause to believe he is removable from the United States. (*Id.* at 6). ICE officers then arrested Defendant pursuant to the immigration warrant.

---

3   According to the Pretrial Services Report, Defendant did not provide the name of his employer, but the Report indicates that he has been employed as a cook since December 1, 2021, he works 60 hours per week, and he earns a monthly income of $3,100. His monthly expenses (primarily consisting of childcare in the amount of $2,500) total $2,770, which leaves him with a monthly cash flow of $330. Defendant explained in his brief that he travelled to the United States for work in order to save money to send home so that his family can build a well and have clean water to drink. (Docket No. 33 at 2). As reflected in the Pretrial Services Report, Defendant sends over 85% of his earnings back to his family to support them. (*Id.* at 3).

Finally, Govt. Ex. E is a public records search of the home address where Defendant was believed to be residing. (Docket No. 32-5). That search indicates that the home is owned by "UC Realty LLC" with an owner address of "ATTN EMILIANO'S" at a location in Cranberry Township. (*Id.* at 1). According to the Government, the Butler County home is located .6 miles from Emiliano's restaurant. (Docket No. 32 at 13).

After reviewing the transcript of the Initial Appearance before Judge Dodge, considering the additional evidence proffered by the Government, the Pretrial Services Report,[4] and the arguments of counsel, the Court concludes that the Government proved, by a preponderance of the evidence, that Defendant poses a serious risk of flight such that a detention hearing is authorized.

## II.    LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3141, *et seq.* (the "BRA"), governs release and detention pending judicial proceedings. Pursuant to 18 U.S.C. § 3145(a)(1), "[i]f a person is ordered released by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court . . . the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release. . . ." A district court exercises *de novo* review over a release order entered by a magistrate judge. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). "De novo review does not require an additional evidentiary hearing[,]" and the district court "may make its independent determination based solely upon the evidence introduced at the prior hearing." *United States v. Kolonis*, No. 2:20-cr-0146, 2020 WL 5253192, at *3 (W.D. Pa. Sept. 3, 2020) (quoting *United States v. Burgess*, No. 2:09-cr-150, 2009 WL 2038148, at *2 (W.D. Pa. July 8, 2009)); *see also United States v. Bastianelli*, Crim. No. 17-

---

[4]    Neither party has objected to the contents of the Pretrial Services Report.

305, 2018 WL 1015269, at *4 (W.D. Pa. Feb. 22, 2018) ("The Court retains the discretion to make its determination after reviewing the record developed before the U.S. Magistrate Judge or to accept additional evidence from the parties and rule on the expanded record."). The Court may incorporate the transcript of the proceedings before the magistrate judge and does so here. *See United States v. Chagra*, 850 F. Supp. 354, 357 (W.D. Pa. 1994). The Court "may also consider any additional evidence or proffers submitted in conjunction with any supplemental proceedings," which it likewise does here. *Burgess*, 2009 WL 2038148, at *1 (citation omitted).

Given the procedural posture of the case, at issue is whether the Government is eligible to seek pretrial detention under 18 U.S.C. § 3142(f)(2)(A) based on its contention that there is a serious risk that Defendant will flee.[5] If the Government has sustained its burden to make that showing, then it is entitled to a detention hearing.

In analyzing this issue, we start with the Supreme Court's admonition that, "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). "The [BRA] provides one such exception by way of a two-step process through which the government may seek pretrial detention." *United States v. Ibarra*, No. 2:24-mj-00385-KFW-1, 2025 WL 27474, at *2 (D. Me. Jan. 3, 2025) (citing 18 U.S.C. §§ 3142(f), (g)).

At the first step, upon the Government's motion, a magistrate judge will determine at a defendant's initial appearance if a detention hearing is authorized under the BRA. 18 U.S.C. § 3142(f). This initial determination "limit[s] the circumstances under which [pretrial] detention

---

[5] According to § 3142(f)(2)(A), "[t]he judicial officer shall hold a hearing to determine whether any condition or combination of conditions set forth in subsection (c) of this section will reasonably assure the appearance of such person as required and the safety of any other person and the community-- upon motion of the attorney for the Government or upon the judicial officer's own motion, in a case that involves-- a serious risk that such person will flee." 18 U.S.C. § 3142(f)(2)(A).

may be sought." *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019) (citations omitted). To that end, the court only may grant the Government's motion for a detention hearing if: (1) the defendant is charged with one of five categories of serious crimes in § 3142(f)(1); (2) poses a serious risk of flight under § 3142(f)(2)(A); or (3) poses a serious risk of obstruction or intimidation under § 3142(f)(2)(B). *See United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986) ("[I]t is reasonable to interpret the statute as authorizing detention only upon proof of a likelihood of flight, a threatened obstruction of justice or a danger of recidivism in one or more of the crimes actually specified by the bail statute."); *United States v. Byrd,* 969 F.2d 106, 109 (5th Cir. 1992) ("A hearing can be held only if one of the [ ] circumstances listed in (f)(1) and (2) is present. . . ."); *Ibarra*, 2025 WL 27474, at *2 (citing 18 U.S.C. § 3142(f)); *United States v. Erazo-Calix*, Case No. 1:24-cr-00150-AKB, 2024 WL 4505038, at *2 (D. Idaho Oct. 16, 2024) (citing 18 U.S.C. § 3142(f)). Absent one of these conditions, the Government's motion for a detention hearing will be denied. *See Himler*, 797 F.2d at 160 ("[T]he requisite circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial.") (citation omitted); *Erazo-Calix*, 2024 WL 4505038, at *2. Accordingly, "[§] 3142(f) serves an important gate-keeping function, by preventing even the *opportunity* to seek detention in all but a certain, narrow subset of cases." *United States v. Subil*, Case No. 2:23-cr-00030-TL, 2023 WL 3866709, at *4 (W.D. Wash. June 7, 2023) (emphasis in original) (internal quotation marks and citation omitted).

Moving on to the second step, if the Government establishes eligibility to seek pretrial detention under § 3142(f), the court will then conduct a detention hearing under §§ 3142(e) and (g) to determine whether detention is warranted. *See United States v. Rodriguez-Fuentes*, No. 5:24-CR-00122-KKC-MAS, 2025 WL 711955, at *2 (E.D. Ky. Mar. 5, 2025). Following the

hearing, detention must be ordered if the judicial officer finds that there is "no condition or combination of conditions [that] will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community, the judicial officer must consider the factors set forth in § 3142(g).

### III. ANALYSIS

At step one of the process pursuant to which pretrial detention may be sought, the Government argued at the Initial Appearance, and reiterates here, that Defendant poses a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A), thus it is eligible to seek pretrial detention. Judge Dodge disagreed, finding that the Government failed to establish, by a preponderance of the evidence, that Defendant is serious risk of flight. (Docket Nos. 22; 26 at 22). As such, a detention hearing was not held in this matter, and Defendant was released on an unsecured appearance bond with conditions. In this appeal, the Court must determine whether the Government sustained its burden to show that Defendant poses a serious risk of flight at step one of the process outlined above such that it is entitled to a detention hearing at step two.

As relevant to the step one inquiry, the BRA does not define "serious risk of flight," nor does it specify factors for courts to consider in analyzing whether there is a serious risk that a defendant will flee.[6] *See* 18 U.S.C. § 3142(f)(2)(A). Furthermore, neither the Supreme Court nor

---

[6] Conversely, the BRA expressly articulates the following four factors for courts to examine in determining whether there are conditions of release that will reasonably assure the defendant's appearance and the safety of the community: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial,

11

the Third Circuit Court of Appeals have outlined factors to consider in analyzing a serious risk of flight under § 3142(f)(2)(A).

Given the absence of controlling authority, the Court has surveyed persuasive authority from other jurisdictions and finds instructive the discussion and analysis of "serious risk of flight" in *United States v. Figueroa-Alvarez*, 681 F. Supp. 3d 1131 (D. Idaho 2023). Therein, the court first highlighted the distinction between risk of flight contained in § 3142(f)(2)(A) and risk of non-appearance, which is referenced in §§ 3142(e) and (g), explaining that risk of flight is a narrower concept than risk of non-appearance. *Id.* at 1136-37; *see also United States v. Gibson*, 384 F. Supp. 3d 955, 965 (N.D. Ind. 2019) ("While Congress chose to use 'serious risk of flight' in subsection (f)(2)(A) to describe this limited scenario under which a defendant will face a detention hearing, Congress settled on very different language when describing the analysis courts must undertake once a detention hearing goes forward."); *United States v. Runsdorf*, Case No. 22-8015-WM, 2022 WL 303548, at *4 (S.D. Fla. Jan. 24, 2022) ("And, the question whether there is a serious risk that the defendant will 'flee' is also distinct from the later inquiry whether conditions of release will reasonably assure the defendant's 'appearance' as required."); *United States v. White*, No. 3:21-mj-04070, 2021 WL 2155441, at *8 (M.D. Tenn. May 27, 2021) (concluding that risk of flight is narrower than risk on non-appearance and that the distinction hinges on intention).

After distinguishing risk of flight from risk of non-appearance, the *Figueroa-Alvarez* court next considered the meaning of "serious risk of flight," noting that "[b]ecause courts interpreting the [BRA] have conflated risk of flight with risk of non-appearance, risk of flight has evaded definition." *Figueroa-Alvarez*, 681 F. Supp. 3d at 1137-38 (citing *White*, 2021 WL 2155441, at

---

sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g).

\*10 (observing that the court "is writing on a largely blank slate with respect to the meaning of 'flight risk.' ")). After surveying cases construing flight as active movement both inside and outside of the jurisdiction and considering the plain meaning of "serious," the *Figueroa-Alvarez* court ultimately found that "a 'serious risk of flight' under § 3142(f)(2)(A) is a great risk – beyond average – that the defendant will intentionally and actively move within or outside the jurisdiction to avoid court proceedings or supervision." *Id.* at 1138. The court then clarified that the Government must demonstrate serious risk of flight by a preponderance of the evidence to trigger a detention hearing under § 3142(f)(2)(A), *id.*, which is consistent with controlling Third Circuit authority. *See Himler*, 797 F.2d at 161 (holding that the Government must prove risk of flight by a preponderance of the evidence). Given the applicable burden of proof, the *Figueroa-Alvarez* court explained that "the Government must demonstrate that it is more likely than not that there is a serious *risk* that the defendant will flee, not that it is more likely than not that the defendant *will* flee." *Figueroa-Alvarez*, 681 F. Supp. 3d at 1138 (emphasis in original). "To do so, the Government must present 'concrete information' not 'mere conclusory allegations.' " *Id.* (citations omitted).

The *Figueroa-Alvarez* court next identified the following four categories of factors it deemed relevant to analyzing serious risk of flight in immigration cases: "(i) incentives to flee; (ii) ability to flee; (iii) ties to the jurisdiction and the United States; and (iv) reliability and trustworthiness of the defendant." *Figueroa-Alvarez*, 681 F. Supp. 3d at 1140. With respect to these categories, the court considers a defendant's incentives to flee based on the weight of the evidence against him and the potential punishment; ability to flee includes consideration of whether he has finances to fund flight, access to fraudulent identity documents to facilitate travel, and ties to individuals who could assist flight; ties to the jurisdiction and the United States

13

encompass the defendant's length of residence in the jurisdiction and the United States, his family ties, his community ties, and his ability to earn income legitimately; and reliability and trustworthiness include whether he has multiple illegal re-entries after removal, has previously violated court-ordered conditions, has previously failed to appear, and abuses alcohol/controlled substances. *Id.* at 1141-45. The *Figueroa-Alvarez* court explained that no one factor is dispositive, but it emphasized that "the prospect of the alien defendant's immigration detention or involuntary deportation if released from criminal custody" is not to be considered in analyzing eligibility for pretrial detention as a serious flight risk. [7] *Id.* at 1140 (citations omitted); *see also United States v. Soriano Nunez*, 928 F.3d 240, 245 n.4 (3d Cir. 2019) ("[T]he presence of an ICE detainer and the threat of potential removal alone are not sufficient to deny BRA pretrial release.") (citing *Ailon-Ailon*, 875 F.3d at 1338-39)); *Ibarra*, 2025 WL 27474, at *3 ("[T]he fact that ICE may involuntarily remove a defendant does not establish their eligibility for pretrial detention as a serious flight risk under section 3142(f)(2)(A)."). Other district courts have since applied the *Figueroa-Alvarez* factors in analyzing serious risk of flight in immigration cases. *See, e.g.*, *Rodriguez-Fuentes*, 2025 WL 711955, at *3; *Ibarra*, 2025 WL 27474, at *3; *Erazo-Calix*, 2024 WL 4505038, at *3-*5.

Although the Court declines to strictly adopt a rigid set of factors for analyzing whether a defendant poses a serious risk of flight under § 3142(f)(2)(A), the Court believes that the factors identified in *Figueroa-Alvarez* are instructive and helpful in conducting the analysis and it will

---

[7] As the Government candidly acknowledges, Defendant's immigration detainer does not justify a categorical grant or denial of bail. (*See* Docket No. 32 at 17-19). To be clear, the Government emphasized at the Initial Appearance that "its proffer today will be separately based [on] the facts [and] personal circumstances as they relate to Mr. Hernandez-Us and not based on the existence of an ICE detainer," (Docket No. 26 at 11), and the Government reiterates in its briefing that a defendant's risk of involuntary removal does not establish a serious risk of flight. (Docket No. 32 at 17) (citing *United States v. Ailon-Ailon*, 875 F.3d 1334, 1337 (10th Cir. 2017) (stating that "a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based")).

consider those factors here. In doing so, the Court concludes that the Government has established by a preponderance of the evidence that Defendant is eligible for detention under 18 U.S.C. § 3142(f)(2)(A) because he poses a serious risk of flight. The Defendant's risk of flight is "beyond average," *Figueroa-Alvarez*, 681 F. Supp. 3d at 1138, for a number of reasons.

First, Defendant has an incentive to flee given that the weight of the evidence against him is strong, as reflected by the grand jury's return of the Indictment which establishes probable cause that the charged offense occurred. *See Kaley v. United States*, 571 U.S. 320, 328 (2014) ("[A]n indictment fair upon its face, and returned by a properly constituted grand jury, . . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged.") (internal quotation marks and citation omitted). Although Defendant is presumed innocent of the illegal re-entry offense, the Government's proffered evidence supports that he was previously removed from the United States and did not subsequently obtain permission from the Secretary of the Department of Homeland Security to lawfully return. *See Figueroa-Alvarez*, 681 F. Supp. 3d at 1141 (observing that "the weight of the evidence in most § 1326 prosecutions is strong," but explaining that weight of the evidence is the least persuasive factor because any consideration of it must acknowledge the defendant's pretrial presumption of innocence). It stands to reason that an individual, like Defendant, who is charged with illegal re-entry has "a strong incentive to flee . . . to avoid the near-certainty of a prison sentence followed by deportation."[8] *United States v. Neves*, 11 F. App'x 6, 8 (1st Cir. 2001).

Next, Defendant has at least some ability to flee. According to the Pretrial Services Report, Defendant has a positive monthly cash flow of $330. While Judge Dodge commented that the

---

[8] It also stands to reason that this remains so even in a case where an individual, like Defendant, faces a statutory maximum term of two years imprisonment and an advisory guideline range of 0-6 months' imprisonment, (*see* Docket No. 32 at 5, n.2) (specifying that the parties agree that Defendant's applicable guideline range is 0-6 months)), where the potential for deportation looms after completion of the federal criminal case.

15

$495 found on his person, which was the only evidence available to her at the time, suggested that he did not have the financial means to finance flight from this jurisdiction, (Docket No. 26 at 22), the subsequently prepared Pretrial Services Report shows that Defendant may have additional funds available. In any event, flight includes active movement both inside and outside of the jurisdiction, thus it does not necessarily encompass costly, far flung international travel. *See Figueroa-Alvarez*, 681 F. Supp. 3d at 1138 ("But flight is not limited to movement outside of the jurisdiction; it can also involve secreting oneself within the jurisdiction by moving to a different locale therein."). Notably, Defendant previously demonstrated an ability to travel from one jurisdiction to another within the United States as shown by his travel from Florida to Louisiana in September 2010 when he was involved in a traffic stop.

Third, consideration of Defendant's ties to this jurisdiction and the United States relative to his foreign ties is "arguably most significant in the 'serious risk of flight' calculus." *Figueroa-Alvarez*, 681 F. Supp. 3d at 1142. On this score, Defendant lacks ties to the United States generally because he has no legal status in this country, and he specifically lacks ties to this District given that he has resided in the Pittsburgh area for only a little over three years.[9] *See Figueroa-Alvarez*, 681 F. Supp. 3d at 1142-43 (explaining that the longer an alien defendant resides in the United States, the less likely he is to flee). Further, there is nothing in the record to suggest that Defendant has strong ties to the suburban Pittsburgh community where he was residing such as "a strong and well-defined network of friends, neighbors, [and] co-workers." *Id.* at 1143 (explaining that community ties "are anchors to the jurisdiction and the United States"). Likewise, there is no evidence that Defendant has family ties in this District, and he otherwise only has one family member (a cousin's wife), who legally resides in the United States in South Carolina, according to

---

9    As specified in the Pretrial Services Report, Defendant was employed as a cook at an area restaurant since December 1, 2021.

16

the Pretrial Services Report. Conversely, Defendant's ties to Guatemala remain strong because his mother, wife, three children, and numerous siblings all reside there. *See id.* at 1143 ("[W]here the balance of an alien defendant's immediate family resides in their home country – and perhaps the alien defendant came to the United States simply to avail himself or herself of economic opportunity to support his or her family abroad - flight is more likely."). Moreover, Defendant's principal reason for being in the United States was to earn money to send to his family in Guatemala, which, until recently, he accomplished without proper work authorization, and ICE's involvement now frustrates that purpose by precluding any illegitimate sources of income. *See id.* at 1144 (concluding, "[o]n balance" that "the absence of prospective employment and income may be probative of serious risk of flight").

Finally, Defendant's prior interactions with immigration authorities, most notably his prior removal and subsequent re-entry to the United States without permission, calls into question his reliability and trustworthiness.[10] *See Figueroa-Alvarez*, 681 F. Supp. 3d at 1144 ("[A]n alien defendant's illegal reentry into the United States after removal is indicative of his or her general disregard for the law and court order.").

In sum, after considering the record as a whole, including the factors identified in *Figueroa-Alvarez*, the Court concludes that the Government has established by a preponderance of the evidence that Defendant poses a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A) and therefore a detention hearing is authorized.

---

10    Defendant's reliability and trustworthiness also are called into question because he previously provided a false name and date of birth to law enforcement when he attempted to enter the United States in May 2005, as proffered by the Government at the Initial Appearance. Defendant did not contest that he provided this false information, but rather took issue that it occurred 20 years ago. (Docket No. 26 at 17-18). Despite the age of the incident, providing a false name and date of birth to the authorities raises some concern about one's trustworthiness.

## IV.  CONCLUSION

Given the Court's determination that Defendant poses a serious risk of flight under 18 U.S.C. § 3142(f)(2)(A), Judge Dodge's finding to the contrary is reversed.  Consequently, a detention hearing is warranted and will be scheduled.  Until that time, the stay of the pretrial release order previously entered by this Court, (*see* Docket No. 25), will remain in effect.

An appropriate Order follows.

*s/ W. Scott Hardy*
W. Scott Hardy
United States District Judge

Dated: March 26, 2025


cc/ecf:  All counsel of record
         United States Marshal